# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### November 9, 2021 Session

## CAROLYN M. STARK ET AL. v. WILLIAM S. MCLEAN ET AL.

**Appeal from the Chancery Court for Dyer County**
**No. 14-CV-73      Tony Childress, Chancellor**

_____

### No. W2020-00086-COA-R3-CV

_____

This appeal involves the consideration of several issues contested among family members, including those pertaining to the fiduciary duties owed by a son who served as a trustee of trusts created by his parents. The trial court granted significant monetary relief to the son's sisters following a bench trial, including for conversion and breach of fiduciary duty, but it rejected other aspects of the sisters' requested relief. The son presently maintains that he should be absolved of liability for his breach of fiduciary duties, whereas his sisters complain that the trial court did not award them sufficient relief. For the reasons stated herein, we affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part; Reversed in Part; Vacated in Part; and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Marianna Williams, Dyersburg, Tennessee, for the appellants, William S. McLean and Stevolyn Farms.

James S. Wilder, Christine A. Coronado, and Becky Dykes Bartell, Dyersburg, Tennessee, for the appellees, Carolyn M. Stark and Susan Lazenby.

### MEMORANDUM OPINION[1]

---

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not

## BACKGROUND AND PROCEDURAL HISTORY

William S. McLean ("Steve"), Susan Lazenby ("Susan"), Carolyn M. Stark ("Carolyn"), and Lyn D. McLean ("Lyn") are the children of William Watson McLean ("Wat") and Polly Viar McLean ("Polly"). Wat and Polly (collectively "the Grantors") are now deceased, and the present litigation concerns a number of claims pertaining to the disposition of certain of their assets, as well as specific rights surrounding former assets of theirs that had been the subject of trust administration. In relevant part, a significant portion of this case has revolved around farmland that formerly belonged to the Grantors and which was later transferred into several trusts. The subject farms are commonly referred to herein as the Edgewood Farm, the Atkins Farm, the Pope Farm, and the Collinsworth Farm.

According to Steve's testimony at the trial of this matter, his parents never received any farm income from the Edgewood Farm, the Atkins Farm, the Pope Farm, or the Collinsworth Farm after 1988, save for cotton income. Steve conducted his own farming operations at these farms, however, and even rented out the farms to third parties. Steve's ongoing actions in benefitting from the farms serve as the primary backdrop for this litigation due to significant events that occurred in March of 2000. Specifically, on March 27, 2000, the Grantors created the Newbern Trust, an irrevocable private trust. The stated purpose of the trust was for the conservation and protection of the Grantors' estate property, to obtain professional management of said property, to provide asset protection for the trust estate, to care for the Grantors and their heirs in the event of the Grantors' death or incapacitation, and to transfer the trust estate to the Grantors' heirs by the means provided therein. Carolyn, Susan, Steve, and Lyn were named secondary beneficiaries, and the original co-trustees of the trust were NAFEP Management Co., Inc., and Steve. NAFEP Management Co., Inc., later resigned as a trustee in November 2009. Of note, the Newbern Trust was the settlor of four contemporaneously-created holding trusts known as the Edgewood Trust, the Atkins Trust, the Pope Trust, and the Collinsworth Trust. As these labels suggest, the purpose of the holding trusts was to hold the aforementioned farmland, which was transferred into them. The Newbern Trust was the primary beneficiary of each of the holding trusts, and Steve served as a co-trustee of the farm trusts.

Under the Newbern Trust, the trustee was afforded discretion to distribute trust principal to the Grantors, but only for listed specific purposes such as "Short term medical care." The beneficial interests of the trust also extended to the right to receive current distributions of income, but as one expert testified to at trial, if the Grantors "didn't take the income, it was added to principal." Pursuant to one provision in the trust, beneficiaries were not permitted to "encumber or hypothecate the beneficial interests held by such beneficiary without the written consent of the Trustee" or to "transfer or sell the beneficial interests held by such beneficiary" without such written consent.

be cited or relied on for any reason in any unrelated case.

On May 4, 2007, following Polly's death, the co-trustees of the Newbern Trust created a "Bypass Trust" known as the Polly Trust. This action was taken in accordance with a particular section of the Newbern Trust, and subsequently, on September 26, 2007, the co-trustees conveyed the four farms in the holding trusts to the Polly Trust. Carolyn, Susan, Steve, and Lyn were designated secondary beneficiaries of the Polly Trust, and Steve served as a co-trustee of the Polly Trust.[2] Several years after the death of his wife, on May 4, 2013, Wat passed away.

The record shows that Steve served as the executor for his mother's estate after her passing, as he had averred at the time that Wat was unable to serve. Following his father's death, Steve filed an "Affidavit as to Small Estate" with the probate court, averring that the total value of Wat's probate estate was $2,343.17.

Given the creation of the above-referenced trusts and the accompanying trustee obligations of Steve with respect to the farmland, Carolyn and Susan (collectively "the Plaintiffs") later filed suit in the Dyer County Chancery Court asserting that Steve had breached his fiduciary duty by, among other things, "misappropriating trust funds within his control for his personal use," "failing to reasonably preserve, protect and manage the [trusts] and their assets for the benefit of the beneficiaries," and "failing to ensure the payment of reasonable rents and profits from tenants of the farm lands of the [trusts.]" As is of relevance to a couple of issues raised in the present appeal, Steve's wife, Donna, was also named as a defendant in the action, as was Lyn. In addition to their grievances about farm income specifically, the Plaintiffs complained that certain bank stock had been transferred from Wat to Donna and that Steve had allegedly converted some of his parents' personal bank funds. The Plaintiffs also asserted multiple fraud claims during the pendency of this case, primarily in relation to alleged representations made by Steve to the USDA Farm Service Agency.

Following a trial that took place over several dates, the trial court entered judgment in favor of the Plaintiffs on multiple counts. Notably, the Plaintiffs received monetary judgments "for crop rent that should have been placed in the trust" and for funds that "Steve . . . converted for his own use," among other relief. Moreover, the trial court determined that "both justice and equity require that [Steve] pay costs and expenses associated with the portion of this judicial proceeding that involved the administration of the trusts over which he was a trustee." The accompanying award to the Plaintiffs, made pursuant to the authority in Tennessee Code Annotated section 35-15-1004, was in an amount less than the Plaintiffs had sought under the statute. Moreover, although prejudgment interest was also awarded to the Plaintiffs, the trial court's orders indicate that its award in this regard did not account for the time between trial and the entry of the court's judgment.

---

[2] NAFEP Management Co., Inc., also served as a co-trustee, but as with the Newbern Trust, it resigned as a trustee in November 2009.

Some of the Plaintiffs' claims were flatly rejected by the trial court. For example, the trial court held that one claim for conversion of funds was barred by the statute of limitations, and it additionally concluded that no relief should be available to the Plaintiffs with respect to their asserted fraud claims. Further, the trial court did not give the Plaintiffs any relief in relation to the bank stock that had been transferred to Donna, and it separately ruled that all claims against Lyn were without merit. This appeal followed.

**DISCUSSION**

This appeal follows a bench trial. We review the trial court's factual findings "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). We review the trial court's adjudication of legal issues de novo with no presumption of correctness. *See Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) ("Questions of law are reviewed de novo with no presumption of correctness.").

As Steve's counsel represented at oral argument, Steve is pursuing two primary issues in this appeal: (1) whether he should be held responsible for violating his fiduciary duty as trustee and (2) whether the award under Tennessee Code Annotated section 35-15-1004 was reasonable and supportable by the law and evidence. Because the Plaintiffs raise their own issues pertaining to the award under Tennessee Code Annotated section 35-15-1004 (among many other discrete issues), we will begin our substantive discussion by turning to Steve's first concern. Issues surrounding the trial court's award under Tennessee Code Annotated section 35-15-1004 will be discussed later in this Opinion.

*Should Steve Be Absolved From Liability as a Fiduciary?*

There does not appear to be any dispute in this case that Steve continued to benefit from the subject farmland following the creation of the trusts in this case. Indeed, as noted earlier, Steve testified openly at trial that his parents never received any farm income from the Edgewood Farm, the Atkins Farm, the Pope Farm, or the Collinsworth Farm after 1988, save for cotton income. Steve's enrichment from the farmland occurred notwithstanding the fact that the farms had been subject to trust administration and that Steve had fiduciary duties in relation to same.

Steve's position appears to be that his parents were able to give up their right to farm income and that it was permissible for him to proceed with "business as usual" after the formation of the trusts. He relies on, among other things, certain *non-trust* materials that had been given to his parents as alleged authority for permitting the course of action he pursued. According to him, he should therefore be "absolve[d]" of liability. Somewhat telling of the lack of viability of his urged outcome, Steve's arguments on appeal are peppered with acknowledgments that countenance against his position. At oral argument, for example, after discussing the non-trust evidence her client attempted to rely upon,

Steve's counsel stated that the problem was "that isn't what the trust said."[3] Moreover, in his brief, Steve acknowledges that the "Trust contains provisions which would prevent them from 'operating as they previously operated.'" At another place in his brief, he submits that the non-trust materials and information he relied upon were "in direct conflict with the terms of the trust." Indeed, Steve readily acknowledges in his brief that under the Newbern Trust, "neither the principal nor income of the trust, while in the hands of the Trustee, shall be subject to assignment and any attempted assignment shall be null and void." He also specifically references another provision, Section 19 of the Newbern Trust, as conflicting with his desired position.

Steve's position, which essentially advocates for a negation of his fiduciary duties as trustee with respect to the farm income, is therefore grounded under a theory of control by his parents that he acknowledges is ultimately non-existent in the trust documents.[4] As his own counsel noted, that simply "isn't what the trust said." Steve may desire for his behavior to be governed by different standards not incorporated into the controlling documents,[5] but the trial court did not err in its decision to hold him accountable for failing to fulfill his fiduciary duties with respect to income derived from the subject farmland. Respectfully, we therefore conclude that the first primary issue raised by Steve is without merit. Below, we shift our attention to a number of issues raised by the Plaintiffs on appeal, before finally turning to the propriety of the trial court's award under Tennessee Code Annotated section 35-15-1004.

*Plaintiffs' Fraud Claims*

The Plaintiffs contend that the trial court incorrectly concluded that they failed to establish their claims for fraud. Upon our review of their argument, we conclude that it is without merit. The Plaintiffs' asserted fraud claims, both intentional and constructive, are

---

[3] She also stated during oral argument that, "It may seem simple to say that if Steve McLean was the trustee of a trust he should have abided by the terms of that trust. But this case is very odd and different in terms of what was in the trust and the information that was provided to the parties before they formed the trust."

[4] It appears that Steve's attempt to rely on certain non-trust materials is due to a contention that certain aspects of the trust terms are internally inconsistent, creating an ambiguity that must be addressed with other evidence. Specifically, Steve refers to part of Section 2 of the Newbern Trust as authority that allegedly signaled continued control by his parents over the farmland and associated income. To the extent his argument is predicated on the referenced part of Section 2, it is unavailing. Indeed, Steve specifically notes that other sections of the trust "are directly opposed to Section 2," and, importantly, he further acknowledges that the relied-upon part of Section 2 was governed by language that provided it was "not . . . intended to override any other provision of the Trust. If there appears to be a conflict between said Paragraphs and other provisions of the Trust, the other provisions shall prevail." To the extent there is any arguable inconsistency between Section 2 and the other trust provisions that clearly conflict with Steve's position, there is therefore no internal ambiguity.

[5] Illustrative of the problem here is an excerpt from Steve's deposition testimony that was admitted into evidence at trial. Therein, Steve stated in part as follows: "[W]hat it says in the trust is not what I had to do."

primarily predicated upon alleged misrepresentations made by Steve to the USDA, thereby causing the USDA Farm Service Agency to pay certain subsidies to ultimately benefit Steve "instead of the rightful recipients, i.e. the individual trusts." One of the intentional fraud claims is also partially predicated upon Steve's failure to deposit a check from the Dyersburg Elevator Company into one of the trusts.[6] We fail to discern how any of these allegations give rise to a cognizable *fraud* claim to be asserted by the Plaintiffs. Indeed, the Plaintiffs' argument on this issue fails to show where any of the McLean family members detrimentally relied upon a misrepresentation. Without question, the Plaintiffs submit they were injured, noting Steve's alleged conversion of funds, and they further aver that misrepresentations were made to the *government*. Yet, nowhere with respect to this issue do the Plaintiffs articulate an injury that resulted from their or their parents' reliance on a misrepresentation. Inasmuch as the narrow question we are dealing with under this issue concerns the appropriateness of fraud claims,[7] this is fatal to the Plaintiffs' pursuit of relief.[8] *See Cornwell v. Hodge*, No. C.A. 44, 1986 WL 5890, at *5 (Tenn. Ct. App. May 23, 1986) (noting in a case wherein plaintiffs contended a constructive fraud was committed that, "[w]ithin an action based on fraud of <u>any</u> type, there must be a misrepresentation of a material fact, <u>upon which the plaintiff must have reasonably relied</u>, thereby suffering damage" (emphases added)).

### *The Question of Lyn's Liability*

We next turn to the question of whether Lyn should be held responsible for actions taken by Steve. The trial court specifically determined that Lyn should not be liable in this case,[9] a point contested by the Plaintiffs on appeal. Respectfully, we hold that the Plaintiffs

---

[6] The included argument in the brief asserts a more expansive claim in this regard, as it appears to take issue with more than the check issue specifically identified in the operative complaint. Indeed, the argument cites Steve's alleged conversion of funds associated with checks "issued by the granary, elevator, or gin to the farm trusts." At another point in their brief, the Plaintiffs submit that additional fraud claims should have been found in Steve's misrepresentations "to the bank," which the Plaintiffs contend allowed Steve to convert funds for personal use.

[7] We express no opinion as to whether these allegations against Steve would have supported another theory of recovery. That question is not before us. The raised issue is whether the argued *fraud* claims should have been dismissed. In any event, as noted in the succeeding footnote, the subsidy payments were accounted for in the damages analysis proffered by the Plaintiffs irrespective of their nominal assertion of fraud claims.

[8] Interestingly, the Plaintiffs' counsel appeared to concede during one hearing that a proper fraud claim was not before the trial court, responding "That's right" to the trial court's statement that the reliance element could not be satisfied here. Even assuming that the Plaintiffs had accurately asserted a properly-understood fraud claim, it is unclear to what end they may be presently seeking relief that has not already been given, certainly at least insofar as they are complaining about the issue of subsidies. Indeed, we observe that in one trial court filing, the Plaintiffs stated as follows: "It is also important to note that the Plaintiffs were not seeking monetary damages for the counts alleging fraud filed against Steve McLean as they were merely alternate causes of action. The U.S.D.A. payments were reconciled by the testimony of Dr. Parrott."

[9] As a result of its conclusion on this issue, the trial court further determined that relief sought by

- 6 -

have waived this issue. "Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue." *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000). Here, the Plaintiffs' brief is deficient when measured against this standard inasmuch as the legal authority they specifically cite to on this issue pertains to circumstances in which a *partnership* may be deemed liable. The issue before us, of course, is Lyn's personal liability, or lack thereof. Given the Plaintiffs' waiver of this issue,[10] we now turn our attention to an issue they have raised relative to discovery in this case.

*Tax Returns*

The next issue raised by the Plaintiffs relates to discovery requests made to Steve for the production of tax returns. A dispute over the requested documents was the subject of a previous agreed order, but when no definitive resolution to the matter was achieved, a motion to compel was filed in 2019,[11] eventually culminating in the following order from the trial court:

1. On December 4, 2014, this Court entered an Agreed Order, affirming the agreement of the parties, in that Steve and Donna McLean would provide their financial and tax records to their attorney . . . and she would retain said records.
2. [Steve's counsel] reported that Mr. Steve McLean retained tax returns for only three years. At the time of the Agreed Order, Mr. McLean should have been in possession of his personal 2011, 2012 and 2013 tax returns.
3. Pursuant to the previous Order of this Court, Steve McLean is ordered to provide his personal 2011, 2012 and 2013 tax returns to the Plaintiffs' attorney within 7 days, or by Wednesday, February 20, 2019.
4. The Plaintiffs may move the Court for an appropriate remedy or sanction should the Defendant fail to comply with this order. A motion seeking a remedy or sanction pursuant to this paragraph shall be filed by no later than the close of business on February 21, 2019.

Although Steve produced the 2011, 2012, and 2013 returns, the Plaintiffs assert that he is guilty of "spoliation" and should be sanctioned for failing to produce *more* years of returns. In concluding their argument on this issue, they specifically request that Steve be ordered to produce "all his tax returns . . . that [they] be allowed further discovery . . . and that [they] be afforded a hearing" on remand. As developed in their brief, the Plaintiffs' request

---

Lyn against Steve was "extinguished."

[10] Although we can only speculate as to whether the Plaintiffs' failure to cite specific legal authority on this issue influenced his decision, we observe that Lyn has not participated in this appeal.

[11] In a letter attached to the motion to compel, the Plaintiffs' counsel specifically asked for "copies of tax returns going back to 2012."

for relief appears to be primarily predicated on an alleged admission Steve made during the course of the trial of this case. Indeed, in relevant part, the Plaintiffs submit that "Steve testified at trial that he had access to all his tax returns from Farm Bureau." Although the Plaintiffs apparently now desire for additional trial proceedings to take place on account of the information Steve's supposed trial revelation points to having been available but wrongfully withheld, it does not appear from the referenced portion of the transcript that the Plaintiffs asked for a continuance so that they could actually obtain, and later introduce into evidence, the documents to which Steve allegedly had admitted access, nor does it appear from the referenced transcript pages that the Plaintiffs sought alternatively, or concurrently, a specific sanction on account of the conduct to which Steve's alleged trial admission pointed. This may be the case, however, because the admission that the Plaintiffs claim exists in the referenced portion of the trial transcript does not, in fact, exist. Although Steve indicated that he had been able to obtain the 2011, 2012, and 2013 returns from Farm Bureau, he *did not* admit, as the Plaintiffs contend, that he had access to all his tax returns from Farm Bureau. Inasmuch as the Plaintiffs' statement on this particular point is simply without support in the record, we decline their invitation to remand for additional proceedings on the matter and therefore turn to the next subject raised for our review.

*The Plaintiffs' Concerns Related to the Disposition of Wat's Bank Stock*

Beyond the specific concerns raised by the Plaintiffs as to income that was derived from the farms in this case following the creation of the subject trusts, the Plaintiffs have separately complained about the disposition of certain bank stock that had belonged to Wat. Notably, the stock at issue was conveyed by Wat to Steve's wife Donna on March 23, 2010. The Plaintiffs raise two issues relative to this stock on appeal, which they posit as involving alternative theories of relief. We will address each issue in turn.

The first theory of relief pursued by the Plaintiffs concerning Wat's bank stock is predicated upon (a) the fact that the stock had never been placed in the Newbern Trust and (b) the alleged notion that Steve had previously breached his fiduciary duty by failing to convey the stock to the Newbern Trust. The Plaintiffs assign error to the trial court for failing to make such a finding about Steve's alleged breach of fiduciary duty, and when articulating the basis for their position in their appellate brief, they rely upon a letter that they assert instructed Steve to convey the stock to the Newbern Trust. We need not scrutinize the substantive claim that the Plaintiffs proffer about this letter because their attempt to tether relief to it is improper. Based on the citation provided in their appellate brief, the document relied upon was merely an exhibit to a deposition. There is no indication that this letter was later introduced into evidence as a trial exhibit,[12] and we

---

[12] From our own examination, we observe that certain excerpts from Steve's deposition were admitted into evidence without objection. It does not appear from our review of the record, however, that either the entire deposition or the letter at issue, which appears to possibly be referenced at places in Steve's deposition and which was originally a specific exhibit to another party's deposition, was ever admitted into evidence at trial. Moreover, as alluded to previously, the citation provided by the Plaintiffs in their brief

- 8 -

therefore find no basis upon which the Plaintiffs may, in reliance on the letter, attribute fault to the trial court for failing to give the specific account to it that they desire. We therefore turn to the alternative theory of relief that the Plaintiffs have pursued in relation to Wat's bank stock.

The second legal theory pursued by the Plaintiffs concerning the bank stock focuses squarely on the bank stock transaction itself. Namely, the Plaintiffs have contended in this litigation that Wat's transfer of bank stock to Donna in March 2010 was the product of undue influence. "The doctrine of undue influence is applicable when a confidential relationship is shown which places one party in a position to exercise control over the mind and will of another." *Fritts v. Abbott*, 938 S.W.2d 420 (Tenn. Ct. App. 1996). The ultimate inquiry is "whether the weaker party's decision was a free and independent one or whether it was induced by the dominant party." *Id.* at 421.

Here, the trial court rejected the Plaintiffs' undue influence claim by first holding that there was not a confidential relationship between Wat and Donna. Notably, however, the court provided additional analysis as to why the Plaintiffs' undue influence claim was without merit "even if a confidential relationship had existed." The trial court found in its order that Wat was "quite independent" in 2010 and "knew how to handle his affairs," and that Donna "did not realize she had become the owner of the[] stock until contacted by someone from First Citizens National Bank." The trial court specifically found that Wat's decision to transfer stock to Donna was "a decision he alone made" and that the decision was "made without influence or pressure from anyone." Indeed, the court concluded that "Wat decided to give those stock to Donna," that "there is nothing at all wrong with that transfer," and that the decision was "made freely" and "not based on control or domination." At the oral argument of this matter, the Plaintiffs' counsel referenced this ruling during the course of her presentation, stating that the trial court "put in an alternative [analysis]" beyond the confidential relationship holding, but curiously, the statement of the issues section of the Plaintiffs' brief does not include it as a concern or raised issue. Indeed, the only issue raised with respect to the Plaintiffs' undue influence claim is "[w]hether the trial court erred in failing to find that a confidential relationship existed between Donna and Wat." Therefore, even assuming that we were to agree with the Plaintiffs that the trial court erred in determining that no confidential relationship existed in this case, their success on that issue would be of no moment given their failure to challenge through a raised issue the court's ultimate findings pertaining to a lack of influence on Wat. As we have noted, the trial court determined, among other things, that Wat's decision was "made freely" and "without influence or pressure from anyone." Given that the Plaintiffs' raised

refers to a deposition exhibit directly, not any identifying trial exhibit number or reference, assuming one had existed if the letter had been introduced at trial. Had the letter been introduced as a trial exhibit, the Plaintiffs' argument about the letter could have therefore nonetheless been subject to waiver. In appeals involving voluminous records such as this one, we cannot be expected to hunt for trial exhibits. "[J]udges are not like pigs, hunting for truffles." *Cartwright v. Jackson Cap. Partners, Ltd. P'ship*, 478 S.W.3d 596, 616 (Tenn. Ct. App. 2015) (quoting *Flowers v. Bd. of Pro. Resp.*, 314 S.W.3d 882, 899 n.35 (Tenn. 2010)).

- 9 -

issue does not challenge the trial court's conclusion that their undue influence claim lacks merit notwithstanding the court's confidential relationship analysis, we hold that any issues pertaining to the trial court's conclusion in that regard have been waived and therefore we do not disturb the court's rejection of the Plaintiffs' claim. *See Champion v. CLC of Dyersburg, LLC*, 359 S.W.3d 161, 163 (Tenn. Ct. App. 2011) ("An issue not raised in an appellant's statement of the issues may be considered waived."); *Lovelace v. Baptist Mem'l Hosp.-Memphis*, No. W2019-00453-COA-R3-CV, 2020 WL 260295, at *5 (Tenn. Ct. App. Jan. 16, 2020) (noting that the failure to challenge one of two independent bases for judgment resulted in the waiver of argument that judgment was inappropriate).

*Conversion Issue*

As alluded to briefly in the background section of this Opinion, one of the issues in this litigation has concerned Steve's conversion of monetary funds that had belonged to his parents. The trial court ultimately concluded that a conversion of over $237,000.00 in funds had in fact occurred, noting in relevant part that Steve did not have the permission of either of his parents to transfer the disputed funds into the accounts where the funds were finally placed and that the funds were converted by Steve for his personal use. Although the court generally entered judgments in the Plaintiffs' favor in light of the conversion that occurred, it also held that a claim related to certain of the converted funds was "barred by the applicable statute of limitation." Indeed, in contrast to funds that the court noted had been run through multiple CDs and otherwise concealed, the court stated, without any real clear explanation, that activities related to certain funds "were not concealed at all and could have been discovered with reasonable care." Whereas Steve has not raised any issue on appeal concerning the trial court's conversion holding, the Plaintiffs argue that the trial court erred in not granting them relief related to the funds the court found had not been concealed.

Although both sides here agree that the relevant limitation period for the conversion claim is three years, *see* Tenn. Code Ann. § 28-3-105 (providing that "actions shall be commenced within three (3) years from the accruing of the cause of action"), they advance different arguments as to the propriety of the trial court's ruling. The Plaintiffs characterize the trial court's conclusion as "[i]nexplicabl[e]," arguing that "[t]he trial court does not identify which facts and circumstances make the [purported non-concealed CD] different" from the other funds that were converted. We agree with the Plaintiffs that the evidence does not support the trial court's conclusion that Steve's actions "were not concealed." The CD at issue here is "CD 664080." This CD derived from "CD 660149," a CD that was in Polly's name and listed *Steve's* address on the account. According to the trial court's order, the transaction pertaining to "CD 660149" was approved by Polly and funded out of her bank account. A CD maintenance form in the record shows that "CD 660149" was closed out by Polly, with the proceeds going, in part, to fund "CD 664080," a CD that was also in Polly's name and listed *Steve's* address. Although the trial court appears to have concluded that subsequent activities regarding these funds were not concealed, we fail to see how this

is the case based on the evidence in this record. As is of specific relevance here, we observe that when "CD 664080" was closed, the action was taken by Steve, who signed as "POA" "For Polly" and directed the funds into a CD in his name. However, the trial court's own findings confirm that Polly did not give permission for this transaction, and it is unclear on what basis she would have discovered it given her apparent confidence in Steve and the fact that *his address* was on the CD account that was closed. Moreover, testimony offered at trial indicated that Polly was bedridden and on hospice at the time of the conversion, and unable to attend to personal financial matters.[13] As to the proceeds of "CD 664080," Steve funded a new CD bearing his name and address and which was payable on death to his wife. Proceeds of this new CD eventually funded another CD bearing Steve's name and address, with Donna as beneficiary, and that CD was ultimately closed with the proceeds going into Steve's personal bank account.

There appears to be a suggestion by the trial court that, unlike the other instances of conversion that the court noted "were not discovered until after this suit was filed," the issue surrounding these particular funds should have somehow been discovered by dint of the access one of the Plaintiffs had to a bank account of Polly's. Certainly, to the extent that the Plaintiffs are in essence pursuing a claim that belonged to their mother, their knowledge can be relevant and potentially limiting of the asserted claim. *See, e.g.*, *Holliman v. McGrew*, 343 S.W.3d 68, 75 (Tenn. Ct. App. 2009) (noting that it is appropriate to consider whether the plaintiff bringing the suit had notice of an actionable wrong even though the action belongs to the decedent). However, the fact cited by the trial court, i.e., that one of the Plaintiffs had access to Polly's bank account, is entirely of no moment. Indeed, there is no proof that access to Polly's bank account by one of the Plaintiffs established access to any of the separate CD accounts such that the conversion should have been discovered. The trial court's order simply fails to cite to any evidence in the record that supports its conclusory determination that the claim at issue is time-barred.

In light of the above discussion, we agree with the Plaintiffs that the trial court erred in failing to hold Steve liable with respect to the proceeds emanating from converted "CD 664080," as the court's conclusion regarding the discoverability of the conversion is not supported by the evidence. On remand, the trial court shall enter a modified judgment consistent with our resolution of this issue.

*Prejudgment interest*

We next turn to the subject of prejudgment interest. An award of prejudgment interest is not a compulsory obligation of the trial court. *Ernest B. Williams IV, PLLC v. Ass'n of Unit Owners of Five Hundred & One Union Bldg.*, No. M2019-02114-COA-R3-

---

[13] It is further worth noting, though, that the converted CD was not even set to mature, relative to its initial term, until a date that occurred after Polly's death. Moreover, with Steve's address being on the account, it is unclear on what basis she would have learned of his tortious actions.

CV, 2021 WL 1306875, at *7 (Tenn. Ct. App. Apr. 7, 2021). Instead, "[t]he issue 'is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion.'" *Id.* (quoting *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). Indeed, by statute, "[p]rejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." Tenn. Code Ann. § 47-14-123. In order to reach an equitable decision, our Supreme Court explained in *Myint* that "a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Myint*, 970 S.W.2d at 927. This Court has construed the *Myint* decision as "shift[ing] the balance to favor awarding prejudgment interest whenever doing so will more fully compensate plaintiffs for the loss of use of their funds." *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000). We have further observed that "[f]airness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Id.*

In this case, the trial court awarded certain prejudgment interest to the Plaintiffs, over $124,000.00 in total to each. The trial court's orders, however, reveal that prejudgment interest was denied in relation to some of the Plaintiffs' monetary recoveries, and it is clear that the awarded prejudgment interest did not, in fact, compensate the Plaintiffs up through the time that the court's judgment was entered.

Having reviewed the trial court's orders that addressed prejudgment interest, and the Plaintiffs' arguments about same, we conclude that the total award of prejudgment interest must be vacated and remanded for the entry of a modified award consistent with our discussion herein. The necessity of a remand on this matter is attributable to several considerations. First, there is the issue of our decision herein to remand for the entry of a modified judgment on the Plaintiffs' CD conversion claim, which creates an additional source of recovery to which prejudgment interest can attach. Indeed, the trial court itself signaled that it would have awarded more prejudgment interest if additional relief stemming from Steve's conversion had been proper.

Second, there is the fact that the trial court's award of prejudgment interest was not calculated to run through the date of entry of judgment. The Plaintiffs brought this to the attention of the trial court before their maintenance of the present appeal, but the trial court rejected their concern, simply stating, without any explanation, that the "Plaintiffs' request for additional prejudgment interest for the span of time from the end of the trial of this matter until the order of judgment was entered is denied." The Plaintiffs argue that this was an abuse of discretion, stating, "Since the trial court already found that the Plaintiffs were entitled to prejudgment interest up to the date of trial, then for the same reasons, they

- 12 -

should be entitled to prejudgment interest from the date of trial until the entry of the judgment." We agree. As noted above, the purpose of awarding prejudgment interest is "to *fully compensate a plaintiff for the loss of the use of funds* to which he or she was legally entitled." *Myint*, 970 S.W.2d at 927 (emphasis added). Here, the trial court's decision to cut off the awarded interest was completely arbitrary, and no explanation was even proffered in an attempt to justify it.

Third, there is the issue of the trial court's specific decision, which is challenged by the Plaintiffs on appeal, to *not* award prejudgment interest on farm crop rent from 2000-2006. The trial court attempted to justify its reasoning on this matter by concluding that, despite Steve's breach of fiduciary duties, no prejudgment interest should be awarded related to 2000-2006 crop rent because, supposedly, Wat and Polly did not want to receive any rent during those years. We agree with the Plaintiffs that the trial court's decision, in this instance as well, was also an abuse of discretion. First, the Plaintiffs correctly observe that the trial court's ruling on this matter was divorced from any consideration of the purpose of prejudgment interest, that is, what will provide full compensation for the loss of funds. Second, the trial court's ruling appears to, somewhat confusingly, disregard its own prior understanding about what was legally relevant in this case as it related to the farm income. Indeed, prior to its ruling on prejudgment interest, the trial court specifically concluded that Wat and Polly "lost the authority to determine what amount of rent for the farms . . . was to be paid" once they placed their farms in trusts. In a sense, it appears that the trial court "split the baby" on this issue, correctly discrediting Steve's defense to the substantive claims against him pertaining to the farms in trust but embracing his arguments nonetheless for purposes of denying prejudgment interest for these claims.

In connection with our decision to remand this issue for the entry of a modified award of prejudgment interest, we note that the trial court appears to have awarded prejudgment interest, at least as to a portion of the monetary recovery by the Plaintiffs, at the maximum allowable rate permitted by statute. For example, one component of the total prejudgment interest awarded, $8,982.18 for certain crop rent, appears to be specifically lifted from the calculations of CPA Robert Newbill, who the court regarded at one place in its findings as "completely credible." Mr. Newbill's calculations applied a 10% interest rate for prejudgment interest. Although the trial court never specified what interest rate it was applying or went into detail at how it arrived at the various amounts of prejudgment interest it opined were proper, other amounts discussed by the court appear to bear no relation to Mr. Newbill's interest calculations. For example, concerning the prejudgment interest on crop rent from 2000-2006 that was not awarded, the trial court stated that it would have awarded an additional $8,589.52 if prejudgment interest should be given for such years. This figure does not appear to derive from Mr. Newbill's calculations, and as stated above, the trial court did not specify at what rate such interest had been assessed.

Although we do not intend to suggest that the trial court was required, or is required, to apply a 10% prejudgment interest rate to all of the monetary awards at issue, we cannot

fully discern the basis for its actions with regard to the interest it awarded or proposed to be awarded. In addressing this matter on remand, the trial court should clearly articulate the rate it is applying to all awards of prejudgment interest. If some cogent reason exists, apart from completely arbitrary action, to apply one interest rate to some awards but a lower rate for others, the trial court should specify in writing the bases for its actions.[14]

*Award under Tennessee Code Annotated section 35-15-1004*

In closing our examination of the issues in this appeal, we turn to the trial court's award against Steve pursuant to Tennessee Code Annotated section 35-15-1004. Under that statute:

> In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

Tenn. Code Ann. § 35-15-1004(a). Here, the trial court's total award pursuant to this statute was $480,000.00, $240,000.00 to each of the Plaintiffs. Both sides have raised a number of varied arguments on appeal as to why the trial court's award was in error, with Steve generally claiming that the trial court's award against him was too high and the Plaintiffs contending that they received insufficient relief. During the trial court hearing concerning the Plaintiffs' request for relief under Tennessee Code Annotated section 35-15-1004, Steve attempted to establish that the Plaintiffs should only recover between $225,000.00 and $275,000.00. For their part, the Plaintiffs attempted to establish that they should recover, in total, well over $670,000.00 pursuant to the statute.

---

[14] Although the Plaintiffs have also complained that they were not awarded prejudgment interest on attorney's fees, we find no reversible error in the trial court's failure to award prejudgment interest relative to attorney's fees given the court's discretion and considering the fact that the fees were subject to dispute prior to judgment (and obviously remain so given our disposition as to attorney's fees discussed *infra*). *See generally In re Estate of Brakebill*, No. E2019-00215-COA-R3-CV, 2020 WL 5874874, at *6 (Tenn. Ct. App. Oct. 2, 2020) (noting that court did not abuse its discretion in not awarding prejudgment interest where the claim was uncertain and subject to reasonable dispute prior to the order approving the requested fee); *Raines Bros., Inc. v. Chitwood*, No. E2015-01430-COA-R3-CV, 2016 WL 3090902, at *8 (Tenn. Ct. App. May 24, 2016) ("In this case, the amount of the attorney's fee award was not set until the trial court determined such amount following remand. Therefore, the trial court did not err in failing to award prejudgment interest on the amount of the attorney's fee award in addition to the amount of the underlying judgment."); *Wilson Cty. Sch. Sys. v. Clifton*, 41 S.W.3d 645, 663 n.13 (Tenn. Ct. App. 2000) ("This case illustrates why, in our view, the award of prejudgment interest on attorney's fees is problematic. As in the present case, the reasonableness of the attorney's fees to be awarded often is disputed, and the amount of the award is not established with certainty until entry of the final judgment. Even in cases where the amount is not disputed, attorney's fees may be gradually incurred over an extended period of time. . . . In such cases, the problem arises as to when prejudgment interest would begin to accrue.").

An award under Tennessee Code Annotated section 35-15-1004(a) lies within the trial court's discretion. *In re Willard R. Sparks Revocable Trust 2004*, No. W2017-01497-COA-R3-CV, 2018 WL 6720687, at *6 (Tenn. Ct. App. Dec. 20, 2018). Having reviewed the record transmitted to us on appeal, we conclude that we are unable to meaningfully review the propriety of the award given pursuant to the statute, particularly with respect to Steve's assertion that certain expenses were improvidently awarded in a manner that is inconsistent with the rules of civil procedure. We cannot broach a review of this issue so as to facilitate any potential redress because it is entirely uncertain as to what expenses were awarded to the Plaintiffs. Indeed, the trial court's award pursuant to Tennessee Code Annotated section 35-15-1004 did not identify what it was specifically composed of, with the court stating generally that "costs and expenses" in the amount of $240,000.00 were awarded to each of the Plaintiffs. Both sides have commented on the lack of clarity as to what made up the total award stated by the trial court. Steve, for instance, remarks in his brief that the trial court "did not provide any specific findings regarding the costs and expenses he awarded." Moreover, for their part, the Plaintiffs state that the "court did not define in its order how the award was allocated" and that it "is unclear how exactly the court limited the award of fees." Assuming *arguendo* that some error may have accompanied the trial court's total award of costs and expenses, we would have no way to identify how to unravel the award, given, as both sides acknowledge, there is an absence of any specific findings regarding what was awarded. The trial court's award is accordingly vacated, and the matter is remanded for specific findings regarding what costs and expenses the trial court is awarding pursuant to the statute.[15]

As for the Plaintiffs' request for attorney's fees on appeal under the statute, this too involves judicial discretion, albeit specifically on the part of this Court. *See Goza v. SunTrust Bank*, No. W2014-00635-COA-R3-CV, 2015 WL 4481267, at *6 (Tenn. Ct. App.

---

[15] One of the Plaintiffs' appellate arguments would, if accepted, appear to obviate the need for a remand for further findings and would instead prompt a remand for the entry of a modified award for the full amount of relief the Plaintiffs have sought under the statute. Indeed, the Plaintiffs contend that they "are entitled to 100% of all the expenses incurred in the prosecution of this lawsuit, in addition to the attorneys' fees, as a matter of law" pursuant to the statute. Concerning this asserted grievance, we note that the operative language of the statutory provision provides that relief may be given "as justice and equity may require." Tenn. Code Ann. § 35-15-1004(a). Not all of the claims asserted in this case related to Steve's administration of the trusts, and the trial court's actions here, despite the lack of clarity otherwise appearing as to what the total award was composed of, reveal that it was attempting to measure the Plaintiffs' recovery in light of this fact. Although the Plaintiffs criticize the trial court's approach, we note that the trial court's approach, i.e., attempting to tailor recovery in a larger lawsuit to the portion of the litigation dealing with trust issues, does not appear to be an entirely novel one. Indeed, as one commentator has observed of the Uniform Trust Code provision on which Tennessee Code Annotated section 35-15-1004 is patterned, some courts applying statutes based on the provision have required fee claimants to apportion fees and costs to allow for their subtraction "when claims covered by the fee statute are joined with claims that were not covered by the statute." Daniel F. Blanchard III, *Attorney's Fees in Judicial Proceedings Involving Trusts, Estates, & Protected Persons: When Is an Award Just & Equitable?*, 72 S.C. L. Rev. 145, 169 (2020).

Jul. 22, 2015).  As outlined earlier in this Opinion, Steve's attempts on appeal to discount his trustee obligations are without merit, a point his own acknowledgements about the terms of the trust documents have readily revealed.  The Plaintiffs were forced to defend against Steve's appellate arguments concerning his fiduciary responsibilities, and they were successful in doing so.  In our view, justice and equity require that they be awarded their reasonable attorney's fees incurred in defense of the issue Steve has pursued on appeal regarding his fiduciary responsibilities under the trust documents.  The specific amount of these attorney's fees is left to the trial court's determination upon the remand of this case.

## CONCLUSION

For the reasons discussed herein, the judgment of the trial court is affirmed in part, reversed in part, and vacated in part, and the case is remanded for further proceedings consistent with this Opinion.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE